UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | Chapter 11 |
| **S & Y ENTERPRISES, LLC,** | Case No. 10-50623 (ESS) |
| **Debtor.** | |

DISCLOSURE STATEMENT FOR
CAB BEDFORD LLC'S PLAN OF REORGANIZATION
OF S&Y ENTERPRISES, LLC DATED AUGUST 10, 2011

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR
REJECTION OF THE CAB PLAN.  ACCEPTANCES OR REJECTIONS MAY
NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN
APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN
APPROVED BY THE BANKRUPTCY COURT.**

I.    INTRODUCTION

This is the first disclosure statement (the "Disclosure Statement")
proposed by creditor CAB Bedford LLC ("CAB Bedford") in the chapter 11 case of
S&Y Enterprises, LLC (the "Debtor" or "S&Y" and, together with debtor Sky
Lofts, LLC, the "Debtors"[1]).  This Disclosure Statement contains a summary of the
principal provisions of the CAB Bedford Plan of Reorganization of S&Y (the "CAB
Plan")[2] filed by CAB Bedford on August 10, 2011.  A copy of the CAB Plan is attached
to this Disclosure Statement as Exhibit A.  CAB Bedford has filed the CAB Plan in light
of events described herein, including expiration of the Debtor's exclusive right to file and
solicit acceptances of a chapter 11 plan on May 9, 2011.  The CAB Plan is premised on a
prompt sale of the Debtors' real property to CAB Bedford for an amount at least
sufficient to pay all Allowed Claims against the Debtors in full in cash.  On the Effective

---

[1]    Sky Lofts, LLC, which filed for relief under chapter 11 of the Bankruptcy Code on December 8, 2010
in the Eastern District of New York (Case No. 10-51510-ESS), is an entity that shares the same
management and equity ownership as the Debtor.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the CAB
Plan.

Date, CAB Bedford will be deemed to waive any and all Claims arising from the Debtors' rejection of their prepetition contract with CAB Bedford for the sale of the Property. For the reasons set forth herein, CAB Bedford believes that, because CAB Bedford's Claims would increase proportionately with each additional dollar offered for the Property by a party other than CAB Bedford, and because only CAB Bedford can waive these Claims, CAB Bedford is the only party capable of proposing a plan that leaves all creditors of the Debtors unimpaired. ***You should read the CAB Plan and this Disclosure Statement carefully and discuss the documents with your attorney. If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the CAB Plan are discussed at pages 16-22 of this Disclosure Statement.

### A.    Purpose of This Document.

This Disclosure Statement describes:

- The Debtors and significant events during their Bankruptcy Cases;

- How the CAB Plan proposes to treat Claims or Interests of the type you hold (*i.e.*, what you will receive on your Claim or Interest in the event the CAB Plan is confirmed);

- Who can vote or object with respect to the CAB Plan;

- What factors the Bankruptcy Court will consider when deciding whether to confirm the CAB Plan;

- Why CAB Bedford believes the CAB Plan is promptly confirmable and the New Plans are not;

- How the treatment of your Claim or Interest under the CAB Plan compares to what you would receive on your Claim or Interest under the competing New Plans, which are premised upon the New Sale Agreement; and

- The effect of confirmation of the CAB Plan.

While CAB Bedford believes that the summaries contained herein provide adequate information with respect to the documents summarized, such summaries are qualified to the extent they do not set forth the entire text of such documents. This Disclosure Statement describes the CAB Plan, but it is the CAB Plan itself that will, if confirmed, establish your rights.

**B.      Deadlines for Voting and Objecting to Plan, Date of Plan Confirmation Hearing.**

The Bankruptcy Court has not yet confirmed the CAB Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the CAB Plan will or will not be confirmed.

*1.      Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the CAB Plan.*

The hearing at which the Bankruptcy Court will determine whether to finally approve this Disclosure Statement will take place on _____ at the U.S. Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East, Courtroom 3585, Brooklyn, New York 11201.

*2.      Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the CAB Plan.*

Objections to this Disclosure Statement or to the confirmation of the CAB Plan must be filed with the Bankruptcy Court by _____ __, 2011, with a courtesy copy to Chambers and served upon each of the following:

(a)      *Counsel for CAB Bedford LLC*:

Kelley A. Cornish, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019

(b)      *The United States Trustee*:

Jacqueline Frome, Esq.
Office of the US Trustee
271 Cadman Plaza East, Suite 4529
Brooklyn, New York  11201

(c)      *Counsel for the Debtors*:

David Carlebach, Esq.
Law Offices of David Carlebach Esq.
40 Exchange Place, Suite 1306
New York, New York  10005

(d)    *Counsel for Capital One, N.A.:*

        Joseph C. Savino, Esq.
        Lazer, Aptheker, Rosella & Yedid, P.C.
        Melville Law Center
        225 Old Country Road
        Melville, New York  11747-2712

(e)    *Counsel for Galster Funding LLC:*

        Brendan M. Scott, Esq.
        Klestadt & Winters LLP
        570 Seventh Avenue, 17th Floor
        New York, New York  10018

(f)    *Counsel for North 3rd Development, LLC:*

        Gregory C. Plotko, Esq.
        Kramer Levin Naftalis & Frankel
        1177 Avenue of the Americas
        New York, New York  10036

(g)    *Counsel for Bedford JV LLC:*

        Janice Mac Avoy, Esq.
        Fried, Frank, Harris, Shriver & Jacobson LLP
        One New York Plaza
        New York, New York 10004

(h)    *Counsel for Yehuda Backer*

        Steven J. Reisman, Esq.
        Curtis, Mallet-Prevost, Colt & Mosle LLP
        101 Park Avenue
        New York, New York 10178-0061

3.    *Contact Person for More Information.*

If you want additional information about the CAB Plan, please contact:

        Jonathan Koevary, Esq.
        Paul, Weiss, Rifkind, Wharton & Garrison LLP
        1285 Avenue of the Americas
        New York, New York  10019-6064
        Telephone Number:  (212) 373-3000

## II.    BACKGROUND[3]

### A.    Description and History of the Debtor's Business.

The Debtor, S&Y, is a New York corporation formed on November 21, 1996 (it was formerly known as Adar Builders and Realty, LLC - the name was changed to S&Y Enterprises, LLC on January 22, 1997). S&Y is the owner of certain real estate located at 130 North 4th St. (a/k/a 193 Berry Street, a/k/a 240 Bedford Ave.), Brooklyn, New York. S&Y's affiliate, Sky Lofts, LLC, is the owner of certain adjoining real estate located at 242-246 Bedford Avenue, Brooklyn, New York (the property owned by S&Y and Sky Lofts, together, the "Property"). S&Y and Sky Lofts have continued to own and operate the Property since the filing of their bankruptcy petitions in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") on November 11, 2010 and December 8, 2010, respectively, as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

### B.    Insiders of the Debtor.

The following is a list of the names of S&Y's insiders as defined in section 101(31) of the Bankruptcy Code and their relationship to the Debtor, as well as compensation paid during the pendency of this Bankruptcy Case.

| Name of Insider | Relationship to Debtor | Compensation During Pendency of Chapter 11 Case |
|---|---|---|
| Yehuda Backer | Managing Member | $    5,433.33 |
| Ruthe Backer | Member | $    0.00 |

### C.    Management of the Debtor Before and During the Bankruptcy.

During the two years prior to the Petition Date and during the Bankruptcy Case, Yehuda Backer was the Managing Member of S&Y. Mr. Backer will remain the Managing Member following the Effective Date.

### D.    Events Leading to Chapter 11 Filing.

Before the Petition Date, Capital One Bank, NA ("Capital One") declared S&Y to be in default of its obligations to Capital One. By letter dated November 2, 2010, Capital One sent a notice of default (the "Notice"), and it made a demand for payment of

---

[3]    This background, based upon information either publicly available on the docket or made available to CAB Bedford through documents obtained through discovery not designated confidential, relies heavily on the Debtors' representations. CAB Bedford is not responsible for any errors, misstatements or omissions in the information relied upon.

the total balance due. In the Notice, Capital One advised S&Y that if it failed to cure the alleged default by November 8, 2010, Capital One would record the deed it held to the real estate owned by S&Y. Subsequently, Capital One agreed that the deadline for curing any default would be extended to November 12, 2010. S&Y was unable to perform as required in the Notice, and therefore filed a voluntary chapter 11 petition on the S&Y Petition Date to avoid the recording of the deed.

    **E.**    **Significant Events During the Bankruptcy Case.**

       *1.*    *The Original Sale Agreement and the Original Plans*

       In early July 2010, principals of CA Bedford Holdings LLC ("CA Holdings"), CAB Bedford's corporate parent, entered into negotiations with Yehuda Backer with respect to a potential purchase of the Property.

       On July 12, 2010, CAB Bedford entered into an Agreement of Sale (the "Original Sale Agreement") with S&Y and Sky Lofts for the purchase of the Property. The Original Sale Agreement provides for a sale of the Property to CAB Bedford in the amount of $20 million in cash and a 60 day closing period without any closing contingencies.

       Concurrent with the execution of the Original Sale Agreement, CA Holdings and Sky Lofts entered into the Operating Agreement of CAB Bedford LLC (the "Operating Agreement"), pursuant to which CA Holdings was appointed as Manager, and CA Holdings and Sky Lofts were allocated a 75% interest and a 25% interest, respectively, in the joint venture.

       On October 15, 2010, CAB Bedford and the Debtors entered into the First Amendment to the Original Sale Agreement, pursuant to which the parties extended the closing date to April 15, 2011. Also, pursuant to the First Amendment, CA Holdings made a $575,000.00 loan to the Debtors, secured by a subordinate mortgage on the Property, at Mr. Backer's request.

       On November 22, 2010, the parties entered into the Second Amendment to the Original Sale Agreement, which, among other things, reduced the purchase price for the Property to $16.5 million. The Second Amendment was expressly subject to approval by the Bankruptcy Court in the S&Y Bankruptcy Case. On the same date, the parties entered into the Side Agreement which makes reference to the Original Sale Agreement, as amended, and the Operating Agreement, and provides, among other things, that Sky Lofts' interest in CAB Bedford would "spring into existence upon closing on the acquisition of the Property and not prior thereto."

       On February 24, 2011, the Debtors filed disclosure statements (as amended on March 7, 2011, the "Original Disclosure Statements") for two corresponding plans of reorganization (as amended on March 7, 2011, the "Original Plans" and together with the Original Disclosure Statements, the "Original Plan Documents") that

contemplated approval of the sale of the Property to CAB Bedford under the Second Amendment to the Original Sale Agreement.

Based upon the Debtors' representation that all non-insider creditors would be paid in full with proceeds from the consummation of the Original Sale Agreement, the Debtors sought to have the Original Plans heard concurrently with approval of the corresponding disclosure statements. By Orders dated March 9, 2011, the Bankruptcy Court scheduled a hearing on the adequacy of the Disclosure Statements and confirmation of the Original Plans for April 28, 2011 (Sky Lofts Dkt. No. 41; S&Y Dkt. No. 35).

On April 27, 2011, Mr. Backer informed CAB Bedford that the Debtors were postponing the April 28, 2011 hearing to May 26, 2011 to address certain objections to confirmation raised by creditors.

2.    *The New Sale Agreement, the Insider Agreements and the New Plans*

On May 11, 2011, the Debtors filed with the Bankruptcy Court the Second Amended Disclosure Statement of Sky Lofts dated May 11, 2011 (the "Sky Lofts Disclosure Statement") [Dkt. No. 58], the Second Amended Disclosure Statement of S&Y, dated May 11, 2011 (the "S&Y Disclosure Statement" and, together with the Sky Lofts Disclosure Statement, the "New Disclosure Statements" [Dkt. No. 42], and confirmation of the Second Amended Plan of Reorganization of Sky Lofts, dated May 11, 2011 (the "Sky Lofts Plan") [Dkt. No. 59] and the Second Amended Plan of Reorganization of S&Y, dated May 11, 2011 (the "S&Y Plan" and, together with the Sky Lofts Plan, the "New Plans" and collectively with the New Disclosure Statements, the "New Plan Documents") [Dkt. No. 43].

The New Plan Documents were based upon a new agreement dated as of May 8, 2011 (the "New Sale Agreement") to sell the Property to a new buyer named Bedford JV LLC (the "New Purchaser") for $21 million, plus certain undisclosed consideration provided to the Debtors' principals, described below. According to the New Disclosure Statements, total Claims against the Debtors aggregate approximately $19.4 million, inclusive of $3.1 million of Insider claims (but exclusive of approximately $2.3 million asserted by Capital One on account of its Claim). *See* New Disclosure Statements §§ III.[4] The Debtors represented that all non-insider creditors were unimpaired under the New Plans and that they intended to seek approval of the New

---

[4]    The New Plan Documents contain certain inconsistencies as to whether the purported insider claims are unimpaired or not. Both New Plans state that the insider claims are "unimpaired" but that they will receive their "pro rata share of . . . excess [sale proceeds]," as opposed to the paid in full treatment of non-insider unsecured creditors. *See* S&Y Plan § 2.07; *see also* Sky Lofts Plan § 2.06. By contrast, both New Disclosure Statements state that insider claims are "impaired." *See* S&Y Disclosure Statement § III.C.3; *see also* Sky Lofts Disclosure Statement § III.C.3.

Disclosure Statements and confirmation of the New Plans at the May 26, 2011 hearing. *See* New Disclosure Statements § I.B.1.

The New Sale Agreement, upon which the New Plans are premised, contains terms that shut down any competitive bidding for the Property and make closing uncertain, including strict prohibitions against negotiating a sale – even on higher and better terms – with any other party, together with an unreasonably attenuated outside closing date. Specifically, the New Sale Agreement provides for the following:

- A seller covenant to "terminate all negotiations with any other parties concerning a sale of the Property." New Sale Agreement § 9(b)(v).

- A seller covenant not to "show or otherwise offer for sale the Property to any other parties or solicit offers to purchase the Property from any other parties and [to] not convey any interest in the Property." *Id.* § 9(b)(xii).

- An unconditional "due diligence" termination right through 5:00 p.m. on May 26, 2011 (*i.e, after* the May 26, 2011 hearing with respect to the New Plan Documents). *Id.* at § 3(a) and (e).

- An outside closing date of up to five (5) years that can further be extended by the New Purchaser "for a period not to exceed an additional five (5) years." *Id.* § 18.

In addition to entering into the New Sale Agreement, the Debtors' principals, Yehuda and Ruthe Backer (the "Backers") and Princeton Bedford, LLC ("Princeton Bedford") (an affiliate of Princeton Holdings, LLC ("Princeton Holdings") and the New Purchaser) entered into a secret letter agreement (the "Insider Letter Agreement") that confers substantial economic benefits on the Backers. The Insider Letter Agreement was never filed with the Court along with the New Plan Documents. Pursuant to the Insider Letter Agreement, and notwithstanding their obligations as fiduciaries to the Debtors' estates and the existence of the Original Sale Agreement, the Backers personally committed:

- to use their "best efforts" to seek approval of the New Disclosure Statements "as expeditiously as possible" and "take all other necessary and appropriate actions to support confirmation of the [New Plans];" *See* Insider Letter Agreement § 1.

- to refrain from "efforts to pursue, propose, support or encourage the pursuit, proposal or support of any other chapter 11 plan or other restructuring or reorganization other than the [New Plans]." *See id.*

- to, in the event that the New Plans are not confirmed, pre-select the New Purchaser as the "stalking horse bidder" with a pre-determined minimum bid of $21 million for the Property. *See id.* § 3(a).

- to give up all of the Debtors' rights and obligations as debtors-in-possession by agreeing to make "all pleadings and filings" in the Debtors' bankruptcy cases, "subject to [Princeton Bedford] approval in its sole and absolute discretion" and to cause their counsel to consult with Fried, Frank, Harris, Shriver & Jacobson (counsel to Princeton Bedford's), regarding "all aspects" of the Debtors' bankruptcy cases. *See id.* § 3(d).

The Insider Letter Agreement also makes reference to the following additional agreements that the Backers entered into with the New Purchaser: (i) that certain Promissory Note dated as of May 8, 2011 by Yehuda Backer, Ruthe Backer, Samuel Backer, and The Backer Group LLC to Princeton Holdings (the "Promissory Note"); and (ii) that certain Collateral Assignment Agreement dated as of May 8, 2011 by and among The Backer Group LLC and Mr. Backer, as assignor, and Princeton Holdings, as assignee (the "Collateral Assignment Agreement").

Pursuant to the Promissory Note, the Backers personally borrowed $2 million from Princeton Holdings (an undisclosed affiliate of the New Purchaser) for the express purpose, among other things, to finance the acquisition of [certain real property in Brooklyn] to be acquired by [the Backers' son]." *See* Promissory Note 9(v).[5] In addition, under the Collateral Assignment Agreement, to secure the $2 million personal loan, the Backers "collaterally assign[ed] and transfer[red] . . . all of [the Backers'] right, title and interest" in their purported insider claims against the Debtors' estates totaling $2,942,258.59, and pledged their equity interests in the Debtors and certain non-debtor affiliates. *See* Collateral Assignment Agreement § 3.

The Insider Letter Agreement, the Promissory Note and the Collateral Assignment Agreement were neither described in nor attached to the New Plan Documents when they were filed with the Bankruptcy Court in connection with the May 26th hearing.

On June 6, 2011, the Debtors filed a notice of transfer of their insider claims to Princeton Holdings (the "Transfer Notices") (*see* Sky Lofts Dkt. No. 69; S&Y Dkt. Nos. 53, 54). The Transfer Notices, however, did not identify Princeton Holdings as an affiliate of the New Purchaser and, therefore, failed to disclose the fact that the claim transfers and the $2 million loan to the Backers were part of the overall new sale transaction.

---

[5]  Specifically, Section 9(v) of the Promissory Note provides as follows: "S. Backer hereby acknowledges and agrees that a portion of the Loan is being funded, in part, to finance the acquisition of [that certain real property located at 333 New York Avenue, Brooklyn, New York] to be acquired by S. Backer within ten (10) Business Days after the date hereof. Accordingly, S. Backer hereby covenants and agrees that S. Backer shall acquire the 333 Property within such ten (10) Business Days and simultaneously with the acquisition thereof, S. Backer shall execute and deliver to [Princeton Holdings] the Mortgage . . . ."

Finally, pursuant to an undisclosed Limited Liability Company Operating Agreement of the New Purchaser dated as of May 8, 2011, the Backers became a 35% member of the New Purchaser. Thus, the New Purchaser deal is an Insider transaction, but this was never disclosed to the Bankruptcy Court prior to the May 26th hearing. [6]

On May 23, 2011, CAB Bedford filed its (I) Request for Adjournment of May 26, 2011 Disclosure Statement/Plan Confirmation Hearing and (II) Objection to the Approval of the Debtors' Second Amended Disclosure Statements dated May 11, 2011 and the Debtors' Second Amended Plans of Reorganization dated May 11, 2011. (Sky Lofts Dkt. No. 63; S&Y Dkt. No. 44) (the "CAB Plan Objection"). As set forth in the CAB Plan Objection, CAB Bedford believes that the sale of the Property to the New Purchaser would give rise to substantial damages in favor of CAB Bedford, thereby increasing total non-insider claims to an amount well in excess of the $21 million cash purchase price under the New Sale Agreement. As a consequence, creditors would be impaired upon rejection of the Original Sale Agreement, and the Debtors cannot confirm the New Plans without solicitation as required by the Bankruptcy Code.

On May 24, 2011, in the wake of the CAB Plan Objection, the Bankruptcy Court held an emergency hearing at which it determined that the Debtors could no longer proceed with approval of the New Disclosure Statements or confirmation of the New Plans on the assumption that unsecured creditors were unimpaired. At a status hearing on May 26, 2011, the Bankruptcy Court authorized a discovery process with respect to, among other things, the issues raised in the CAB Plan Objection.

3.    *CAB Bedford's Damage Claims Arising From Rejection of the Original Sale Agreement*

To facilitate a sale of the Property to the New Purchaser and their secret agreements with the Debtors' principals, on June 14, 2011, the Debtors filed a motion seeking to reject the Original Sale Agreement and to fix CAB Bedford's resultant damage claims at $100,000.00 (as amended on July 19, 2011, the "Rejection Motions"). The Rejection Motions are scheduled to be heard by the Bankruptcy Court on August 11, 2011. CAB Bedford believes the relief sought by the Debtors in the Rejection Motions is wholly without merit. CAB Bedford believes that, upon rejection of the Original Sale Agreement, CAB Bedford will have a substantial rejection damage claim flowing from its contractual right to specific performance of the Original Sale Agreement, plus damages for unjust enrichment to the extent of the additional value conferred on the Property by CAB Bedford since execution of the Original Sale Agreement in July 2010. An explanation of CAB Bedford's damage claims arising upon rejection follows.

---

[6]    It is CAB Bedford's belief that at the time of negotiating and executing the agreements that comprise the new sale transaction with the New Purchaser, the Debtors and the Backers were not represented by separate counsel.

(i)    CAB Bedford's Rejection Damage Claim

Section 18.B of the Original Sale Agreement provides that:

if Seller defaults in its obligations to sell and convey the
Property to Buyer pursuant to this Agreement, Buyer's sole
and exclusive remedy shall be *to elect one of the
following:* (a) to terminate this Agreement, in which event
Buyer shall be entitled to the return of the Deposit along
with reimbursement from Seller of the reasonable out-of-
pocket costs of Buyer incurred in connection with this
Agreement, but in no event more than One Hundred
Thousand Dollars ($100,000.00), *or* (b) to bring a suit for
specific performance provided that any suit for specific
performance must be brought as to the Property within 90
days of Seller's default.

Original Sale Agreement § 18.B (the "Remedies Provision") (emphasis supplied).

Although the Original Sale Agreement contains a liquidated damages
provision, it is not CAB Bedford's exclusive remedy. Rather, the Remedies Provision
affords CAB Bedford the right to elect between one of *two* remedies if the Debtors
breach the Original Sale Agreement: (i) termination of the Agreement, plus
reimbursement of the deposit and costs not to exceed $100,000.00, *or* (ii) commencement
of an action for specific performance. Under section 365(g)(1) of the Bankruptcy Code,
rejection of the Original Sale Agreement will constitute a breach of the Agreement, and
CAB Bedford will be entitled to its remedies under the Original Sale Agreement in
accordance with New York state law. Under the circumstances, CAB Bedford would
elect to pursue its "benefit of the bargain" remedy, *i.e.*, specific performance.

However, where the counterparty to a rejected contract seeks to exercise
its right to specific performance, most bankruptcy courts will not grant specific
performance, but instead the counterparty is entitled to a damage claim under section
101(5)(B) of the Bankruptcy Code. Specifically, section 101(5)(B) of the Bankruptcy
Code defines a "claim" as the "right to an equitable remedy for breach of performance if
such breach gives rise to a right to payment, whether or not such right to an equitable
remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed,
undisputed, secured, or unsecured." 11 U.S.C. § 101(5)(B).

Under New York law, where a seller breaches a contract for the sale of
real property, the buyer is entitled to monetary damages, which are measured under these
circumstances by the difference in the original contract price and the actual sale price.
The cash purchase price under the New Sale Agreement is $1 million more than the cash
purchase price of the Original Sale Agreement (*i.e.*, the difference between the $21
million cash purchase price under the New Sale Agreement and the $20 million cash
purchase price under the Original Sale Agreement, before accounting for the interests

afforded to the Debtors or their principals under the two transactions). Therefore, if the Original Sale Agreement is rejected, CAB Bedford's damages arising from its specific performance remedy will be at least $1 million. If, however, the Debtors ultimately sell the Property to the New Purchaser or another third party for an amount higher than $21 million, CAB Bedford's rejection damages claim will increase on a dollar-for-dollar basis.

(ii)    CAB Bedford's Unjust Enrichment Claim

If the Original Sale Agreement is rejected, and whether or not the Bankruptcy Court determines that CAB Bedford is entitled to rejection damages in an amount in excess of $100,000.00, CAB Bedford will assert an additional unjust enrichment claim for the substantial value conferred on the Debtors as a result of its efforts and expenditures in improving the Property in anticipation of consummating the Original Sale Agreement. To establish an unjust enrichment claim, CAB Bedford must show that (i) the Debtors were enriched, (ii) at CAB Bedford's expense, and (iii) that it is against equity and good conscience to permit the Debtors to retain what is sought to be recovered.

CAB Bedford will demonstrate that, from the execution of the Original Sale Agreement in July 2010 through May 11, 2011, when CAB Bedford first learned of the Debtors' intent to enter into the New Sale Agreement, CAB Bedford and its professionals expended substantial sums and used their know-how and contacts in the industry to improve the Property, including: (i) extensive architectural and construction planning for the development of the Property; (ii) obtaining a critical preconditional zoning waiver; and (iii) contacting over 200 brokers and prospective tenants and engaging in discussions with over 40 prospective tenants, which ultimately resulted in CAB Bedford securing several pending retail tenants, two (2) grocery anchors, two (2) banks and a fitness center. Based upon these efforts and expenditures, CAB Bedford believes that it is entitled to recovery on a substantial claim for unjust enrichment regardless of the amount of its separate rejection damage claim.

*4.    CAB Bedford's New Offer Under the CAB Plan*

The Debtors have not made any attempt to ensure that they have obtained the "highest and best" offer for the Property by negotiating with CAB Bedford since entering into their secret agreements with the New Purchaser. Nonetheless, CAB Bedford is willing to purchase the Property on the terms set forth in the Term Sheet annexed to the CAB Plan as Exhibit A (the "New CAB Offer"). The essence of the New CAB Offer is that CAB Bedford will (i) pay $21,969,118.00 to the Debtors' estates for the Property at closing, with any excess sale proceeds remaining in the Disputed Non-Insider Claims Reserve after all non-Insider Claims are resolved to be paid to the Debtors' estates, and any excess sale proceeds remaining in the Disputed Insider Claim Reserve after all Insider Claims are resolved to be paid to CAB Bedford or its designee, (ii) waive any and all claims arising from the Debtors' rejection of the Original Sale Agreement, and (iii) close within 14 days after entry of an order confirming this Plan. Thus, all creditors will be paid in full, in cash, and, therefore, will be unimpaired under

the CAB Plan, with any excess sale proceeds remaining in the Disputed Non-Insider Claims Reserve to be retained by the Debtors for the benefit of its members.

>    5.    *The New CAB Offer is Higher and Better than the New Plans, and CAB Bedford is the Only Party Capable of Proposing a Plan that Will Pay all Allowed Claims in Full*

The New Plans are falsely premised on the assumption that all Claims will be paid in full in cash from the proceeds of the sale of the Property to the New Purchaser. The New Plans also provide for a recovery to the Debtors' principals (*i.e.*, a direct 35% interest in the New Purchaser, plus the other benefits conferred in the Insider Letter Agreement). However, the New Plans are not confirmable for at least two reasons. First, the New Plans are patently unconfirmable because (i) they do not properly specify the treatment of unsecured claims (which actually are impaired), as required by section 1123(a)(3) of the Bankruptcy Code, and (ii) the Debtors do not intend to solicit acceptance of the New Plans from impaired unsecured creditors. As demonstrated below, the $21 million cash purchase price under the New Plans will be insufficient to pay all Allowed Claims in full, after taking into account the substantial damage claims held by CAB Bedford resulting from the Debtors' rejection of the Original Sale Agreement. Because unsecured creditors will be impaired under the New Plans, section 1123(a)(3) requires that their treatment be so specified, and section 1129(a)(8) of the Bankruptcy Code requires that such impaired creditors be solicited to accept a plan by the requisite majorities. None of these requirements have been, or will be, satisfied.

Second, the New Plans are not confirmable because, absent acceptance by impaired unsecured creditors in the requisite majorities (which is highly unlikely in view of the fact that creditors will be paid in full under the competing CAB Plan), the New Plans violate the absolute priority rule. Specifically, the New Plans and related secret agreements provide for a recovery to the Debtors' principals, without paying all creditors in full, by permitting the Backers to retain their Interests in the Debtors, and giving them a 35% interest in the New Purchaser plus the benefits of the Insider Letter Agreement. *See* New Plans § 2.08. In light of CAB Bedford's substantial damage claims arising from the Debtors' rejection of the Original Sale Agreement, the New Plans cannot pay all Claims in full and, therefore, are prohibited by the absolute priority rule from providing any recovery to the Debtors' principals.

Therefore, the New Plans do not contain "the highest and best" offer for the Property. In contrast, the New CAB Offer will pay all Allowed Claims in full by virtue of CAB Bedford's waiver of its substantial damage claims arising from the rejection of the Original Sale Agreement.

Indeed, the New CAB Offer is and will always be higher and better than *any* other offer by a third-party (including the New Plans) because each additional dollar offered to the Debtors for the Property by any entity other than CAB Bedford necessarily increases CAB Bedford's damage claim proportionately, thereby also increasing the shortfall with respect to the amount necessary to pay all claims in full. Moreover, the New CAB Offer is superior because it provides certainty of prompt payment in full for

creditors by avoiding the expense and delay of litigation over the complex issues of the nature and amount of CAB Bedford's damages claims.

      The following table demonstrates that the New CAB Offer is "higher and better" than the New Plans and, indeed, will always be "higher and better" than any competing offer that must take into account payment of CAB Bedford's substantial damage claim arising from rejection:

| OFFERS | CAB BEDFORD DAMAGE CLAIM | CASH NECESSARY TO PAY ALL CLAIMS IN FULL | CASH SHORTFALL |
|---|---|---|---|
| New CAB Offer: $21,969,118.00, plus waiver of all rejection damage claims | $0 (Claims waived) | $21.97 million[7] | $0 |
| New Purchaser Offer: $21 million cash, plus value of Backer 35% interest in New Purchaser and other "Insider" consideration | At least $1 million (difference between (i) Prepetition CAB Offer of $20 million cash plus value of 25% "back-end" interest to Debtors, and (ii) New Purchaser Offer) | At least $22.97 million | At least $1.97 million |
| Hypothetical Offer: $23 million by New Purchaser or other third party overbid | At least $3 million | At least $24.97 million | At least $1.97 million |

---

[7] This analysis assumes that the maximum total Allowed Claims in the Debtors' cases, without taking into account the CAB Bedford damage claims, is $21.97 million, based upon the Debtors' schedules, filed proofs of claim, objections to previously proposed plans and projected administrative claims, including professional and trustee fees.

6.    *Termination of the Debtors' Exclusivity*

Section 1121 of the Bankruptcy Code establishes the time periods within which a debtor has the exclusive right to file and solicit acceptances of a plan of reorganization. *See* 11 U.S.C. §§ 1121(b), (c). Sections 1121(b) and (c) afford a debtor a 120-day period to propose a plan and a 180-day period to solicit acceptance of such plan (as of the petition date). *See id.*

Section 1121(c)(3) of the Bankruptcy Code provides that, "[a]ny party in interest, including . . . a creditor . . . may file a plan if and only if – the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interest that is impaired under the plan." 11 U.S.C. § 1121(c)(3). The Bankruptcy Code thus gives debtors an additional sixty (60) days of exclusivity (measured from the petition date) upon the filing of a proposed plan within the proscribed 120-day period to solicit acceptances from impaired creditors.

S&Y filed its chapter 11 petition on November 11, 2010, and Sky Lofts filed its chapter 11 petition on December 8, 2010. The Debtors have not, within the exclusive periods, sought or obtained an extension of the exclusivity periods. Therefore, S&Y's exclusivity period terminated on May 9, 2011 and Sky Loft's exclusivity period terminated on June 6, 2011. Consequently, CAB Bedford is entitled to file and seek confirmation of CAB Bedford's Plans of Reorganization for S&Y and Sky Lofts.

7.    *Miscellaneous*

There have not been any asset sales outside the ordinary course of business, debtor-in-possession financing, or cash collateral orders.

On December 2, 2010, an Application to Employ the Law Offices of David Carlebach, Esq. as counsel to S&Y was filed with the Bankruptcy Court (Dkt. No. 12), and on February 25, 2011, the Bankruptcy Court entered an Order granting Debtor's application to employ the Law Offices of David Carlebach, Esq. as Counsel to the Debtor (Dkt. No. 30).

In the S&Y Bankruptcy Case, on January 11, 2011, the Bankruptcy Court established the bar date for all creditors to file proofs of claim, that deadline is March 4, 2011 (Dkt. No. 20).

On December 6, 2010, S&Y commenced an adversary proceeding against Capital One captioned *S&Y Enterprises LLC* v. *Capital One, N.A.*, Adversary Proceeding No. 10-01328-ESS (the "Capital One Adversary Proceeding"). In its Complaint, S&Y alleges, *inter alia*, that Capital One asserted baseless defaults under the loan documents so that it could record the deed it held and wrest ownership of the Property from S&Y. The Complaint also alleges, *inter alia*, that Capital One damaged S&Y by sabotaging the sale of the S&Y Property. The Complaint seeks compensatory and punitive damages. On January 26, 2011, S&Y filed its Amended Complaint in the Capital One Adversary Proceeding (the "Amended Complaint"). The allegations concerning S&Y remained

essentially the same as in the original Complaint. The Amended Complaint added Sky Lofts and debtor affiliate Twin City Lofts, LLC as plaintiffs. The Amended Complaint seeks both compensatory and punitive damages by all plaintiffs against Capital One.

The following actions or proceedings were pending against the Debtor and its property, and are now stayed as against the Debtor:

*North 3rd Development, LLC* v. *Sky Lofts, LLC, et al.* (Kings County, New York, Civil Supreme Court, Index No. 29927/2010).

**F.    Projected Recovery of Avoidable Transfers.**

CAB Bedford is unaware of any known preference, fraudulent conveyance, or other avoidance actions.

**G.    Claims Objections.**

The procedures for resolving Disputed Claims are set forth in Article VII of the CAB Plan.

## III.    SUMMARY OF THE CAB PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**A.    Purpose of the CAB Plan for Reorganization.**

As required by the Bankruptcy Code, the CAB Plan places Claims and Interests in various classes and describes the treatment each class will receive. The CAB Plan also states whether each class of Claims or Interests is impaired or unimpaired. If the CAB Plan is confirmed, your recovery will be limited to the amount provided in the CAB Plan.

**B.    Unclassified Claims.**

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the CAB Plan. They may, however, object if, in their view, their treatment under the CAB Plan does not comply with that required by the Bankruptcy Code. As such, CAB Bedford has not placed the following Claim in any class:

*1.    Administrative Expenses.*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under section 507(a)(2) of the Bankruptcy Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within twenty (20) days before Petition Date. The following chart lists the Debtor's estimated administrative expenses,

according to the New Disclosure Statements, and their proposed treatment under the CAB Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Allowed Professional Fees, as approved by the Bankruptcy Court (counsel and accountant) | Approximately $200,000.00 | Paid in full on the Initial Distribution Date, or, if Allowed subsequent to the Effective Date, then within ten (10) days of entry of a Final Order providing for such Allowance, by the Debtor using the proceeds of the sale of the Property. |
| Office of the U.S. Trustee fees | $325.00 | Paid in full on the Initial Distribution Date. |

### C.    Classes of Claims and Interests.

The following are the classes of Claims set forth in the CAB Plan, and the proposed treatment that they will receive under the CAB Plan:

*1.    Classes of Secured Claims.*

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under section 506 of the Bankruptcy Code. If the value of the collateral or setoff securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing Debtor's secured prepetition Claims and the proposed treatment under the CAB Plan:

| Class # | Description | Insider? | Impairment | Treatment |
|---|---|---|---|---|
| I | *Capital One Secured Claim*<br><br>$5,602,619.00, plus accrued and unpaid interest and fees in an amount not to exceed the Capital One Disputed Claim Amount of $2,466,666.67.<br><br>Collateral description: First Mortgage on the S&Y Property located at: 130 North 4th St. (a/k/a 193 Berry Street, a/k/a 240 Bedford Ave.), Brooklyn, New York | NO | Unimpaired | The Capital One Secured Claim shall be Allowed and paid in full in cash on the Initial Distribution Date. As of the Effective Date, an amount equal to the Capital One Disputed Claim Amount will be transferred to the Disputed Claims Reserve to be distributed pursuant to Article VI of the CAB Plan. |
| II | *CAB Bedford Secured Claim*<br><br>Collateral description: Mortgage on S&Y's property located at: 130 North 4th St. (a/k/a 193 Berry Street, a/k/a 240 Bedford Ave.), Brooklyn, New York<br><br>$575,000.00 plus all accrued and unpaid interest | NO | Unimpaired | Paid in full in cash on the Initial Distribution Date. |
| III | *Galster Funding Secured Claim*<br><br>Collateral description: Mortgage on S&Y's property located at: 130 North 4th St. (a/k/a 193 Berry Street, a/k/a 240 Bedford Ave.), Brooklyn, New York<br><br>Allowed Secured Amount: $750,000.00, plus accrued and unpaid interest | NO | Unimpaired | Paid in full in cash on the Initial Distribution Date. |

2.    *Classes of Priority Unsecured Claims.*

Certain priority unsecured claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes.

| Class # | Description | Insider? | Impairment | Treatment |
|---|---|---|---|---|
| IV | *Priority Unsecured Claims of:*<br><br>New York State Department of Taxation and Finance: $100.00<br><br>New York City Department of Finance: $49,433.58.00<br><br>Internal Revenue Service: $143.00 | NO | Unimpaired | Paid in full in cash on the Initial Distribution Date. |

3.    *Classes of General Unsecured Claims.*

General unsecured claims are not secured by property of the estate and are not entitled to priority under section 507(a) of the Bankruptcy Code.

The following chart lists all classes containing the Debtor's unsecured prepetition claims and the proposed treatment under the CAB Plan:

| Class # | Description | Insider? | Impairment | Treatment |
|---|---|---|---|---|
| V | All non-Insider general unsecured Claims, which aggregate to $45,106.00, plus the North 3rd S&Y Claim (of $0 to $800,569.00) and non-Insider general unsecured Claims arising from the rejection of any executory contracts (excluding any Claim of CAB Bedford arising from or in connection with the rejection of the Original Sale Agreement, which is waived pursuant to the New CAB Offer). | NO | Unimpaired | Class V Claims, to the extent Allowed, shall be paid in full in cash on the Initial Distribution Date. To the extent a Class V Claim is neither Allowed nor disallowed as of the Effective Date, an amount equal to the disputed portion of any claim shall be held in the Disputed Non-Insider Claims |

| Class # | Description | Insider? | Impairment | Treatment |
|---|---|---|---|---|
| | | | | Reserve to be distributed pursuant to Article VI of the CAB Plan. |
| VI | All Insider general unsecured Claims, which aggregate to $2,269,000.00. | YES | Unimpaired | Class VI Claims, to the extent Allowed on the Effective Date, shall be paid in full in cash on the Initial Distribution Date. To the extent a Class VI Claim is neither Allowed nor disallowed as of the Effective Date, an amount equal to the disputed portion of any such Claim shall be held in the Disputed Insider Claims Reserve pending resolution of the Claim. The Allowed amount of the Claim shall be paid in full in cash to the holder of such Claim within ten (10) days of entry of a Final Order providing for such allowance. |

    4.    *Class of Equity Interest Holders.*

       Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity Interest holders.

       The following chart sets forth the CAB Plan's proposed treatment of the class of equity Interest holders.

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| VII | Equity Interest holders:<br>Yehuda Backer<br>   99% Equity Interest holder<br>Ruthe Backer<br>   1% Equity Interest holder | Unimpaired | Upon the Effective Date, holders of Class VII Interests shall retain their Interests in the Debtor's estates. |

### D.    Means of Implementing the CAB Plan.

#### 1.    Source of Payments.

In accordance with the New CAB Offer, upon the Effective Date, the Debtors will transfer the Property, free and clear of all liens and claims, to CA Holdings in exchange for a total purchase price of $21,969,118.00.  CAB Bedford will deposit $1,000,000.00 in the Purchase Escrow prior to the Confirmation Hearing.  As consideration for transfer of the Property, upon the Effective Date, CAB Bedford shall release the Purchase Escrow and tender the Balance to the Debtors to be distributed pursuant to the terms of Article VI of the CAB Plan.  As of the Effective Date, CAB Bedford will be deemed to have waived all claims arising from and in connection with the rejection of the Original Sale Agreement.

On and after the Effective Date, the Debtor shall retain and have the sole right to prosecute the Capital One Adversary Proceeding.

#### 2.    Distribution

Pursuant to Article VI of the CAB Plan, all Claims that are Allowed Claims on the Effective Date will be paid in full and in cash to the Record Holder from the Purchase Consideration on the Initial Distribution Date.  Cash on account of Disputed Claims sufficient to pay such Claims in full to the extent such Claims are Allowed, will be held in the Disputed Non-Insider Claims Reserve and the Dispute Insider Claims Reserve, as applicable, pending resolution as further set forth in Articles VI and VII of the CAB Plan.

#### 3.    Claims Allowance and Disallowance

Article VII of the CAB Plan sets forth the procedures for allowance and disallowance of Claims.  All Insider Claims are deemed Disputed Claims pursuant to the CAB Plans.  Any excess sale proceeds held in the Disputed Insider Claims Reserve after resolution of all Insider Claims shall be paid to CAB Bedford.

#### 4.    Post-Confirmation Management.

Upon the Effective Date, the Debtor's managing member will continue to manage the Debtor's affairs.

### E.    Risk Factors.

CAB Bedford does not believe that there are any risk factors with respect to the distributions required under the CAB Plan.

### F.    Executory Contracts and Unexpired Leases.

The CAB Plan, at Section 8.01, lists all executory contracts and unexpired leases of the Debtor.  The Debtor will not assume any executory contracts or unexpired leases.

### G.    Tax Consequences of the CAB Plan.

*Creditors and Interest Holders Concerned with How the CAB Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.*

CAB Bedford does not believe that there are any special tax consequences associated with the CAB Plan.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the CAB Plan must meet the requirements listed in either sections 1129(a) or (b) of the Bankruptcy Code.  The requirements include that the CAB Plan must be proposed in good faith; at least one impaired class of claims must accept the CAB Plan, without counting votes of insiders; the CAB Plan must distribute to each creditor and equity Interest holder at least as much as the creditor or equity Interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity Interest holder votes to accept the CAB Plan; and the CAB Plan must be feasible.  These requirements are not the only requirements listed in section 1129 of the Bankruptcy Code, and they are not the only requirements for confirmation.

### A.    Who May Vote or Object.

Any party in interest may object to the confirmation of the CAB Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the CAB Plan.  A creditor or Interest holder has a right to vote for or against the CAB Plan only if that creditor or Interest holder has a claim or interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the CAB Bedford believes that no classes of Claims or Interests are impaired and that holders of Claims and Interests in each class are therefore not entitled to vote to accept or reject the CAB Plan.

*1.    Who is **Not** Entitled to Vote.*

The holders of the following six types of Claims and equity Interests are not entitled to vote:

1.    Holders of Claims and Interests that have been disallowed by an order of the Bankruptcy Court;

2.    Holders of other Claims or Interests that are not "Allowed Claims" or "Allowed Interests," unless they have been "Allowed" for voting purposes;

3.    Holders of Claims or Interests in unimpaired classes;

4.    Holders of Claims entitled to priority under sections 507(a)(2), (a)(3) and (a)(8) of the Bankruptcy Code;

5.    Holders of Claims or Interests in classes that do not receive or retain any value under the CAB Plan; and

6.    Administrative Expense Claims.

**Even If You Are Not Entitled to Vote on the CAB Plan, You Have a Right to Object to the Confirmation of the CAB Plan and to the Adequacy of the Disclosure Statement.**

**B.    Liquidation Analysis.**

To confirm the CAB Plan, the Bankruptcy Court must find that all creditors and equity Interest holders who do not accept the CAB Plan will receive at least as much under the CAB Plan as such claim and equity Interest holders would receive in a chapter 7 liquidation. Pursuant to the CAB Plan, all creditors are paid in full on account of their Allowed Claims and equity Interest holders will retain their Interests in the Debtor, therefore, all creditors and equity Interest holders will receive at least as much as they would have received in a chapter 7 liquidation.

**C.    Feasibility.**

The Bankruptcy Court must find that confirmation of the CAB Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the CAB Plan.

*1.    Ability to Fund Plan.*

CAB Bedford shall release the Purchase Escrow and tender the Balance to the Debtors in exchange for the Property free and clear of all liens and claims, and CAB Bedford shall waive any and all of its Claims arising or in connection with the rejection

of the Original Sale Agreement. These payments and waivers are sufficient to fund all payments under the CAB Plan.

> 2.    *Ability to Make Future Plan Payments and Operate Without Further Reorganization.*

All payments not made on account of Claims that are not Allowed Claims as of the Effective Date or any fees due as of the Effective Date, shall be made from the Disputed Non-Insider Claims Reserve or the Disputed Insider Claims Reserve. Upon confirmation of the CAB Plan, the Debtor will no longer own the Property or carry any debt, secured or unsecured. The Debtor's managing member will wind down the assets of the estate and administer the claims resolution process in accordance with the Plan.

## V.    RETENTION OF JURISDICTION

9.01    The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Case and the CAB Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided therein; (4) to resolve disputes as to the ownership of any Claim or Interest; (5) to hear and determine timely objections to, or other proceedings challenging the allowance of Claims; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the CAB Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the CAB Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the CAB Plan; (11) to hear and determine any issue for which the CAB Plan requires an order of, or other relief from, the Bankruptcy Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine any Causes of Action preserved under the CAB Plan; and (14) to enter a final decree closing the Bankruptcy Case.

# VI.    MISCELLANEOUS PROVISIONS

### A.    Modification of the CAB Plan.

*1.    Pre-Confirmation Modifications.*

CAB Bedford may alter, amend, or modify the CAB Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

*2.    Post-Confirmation Immaterial Modifications.*

After the Confirmation Date, CAB Bedford may, with the approval of the Bankruptcy Court, without notice to all holders of Claims and Interests, insofar as it does not materially and adversely affect the holders of Claims and Interests, correct any defect, omission or inconsistency in the CAB Plan in such manner and to such extent as may be necessary to facilitate consummation of the CAB Plan.

*3.    Post-Confirmation Material Modifications.*

After the Confirmation Date, CAB Bedford may alter or amend the CAB Plan in a manner which, as determined by the Bankruptcy Court, materially and adversely affects holders of Claims or Interests, provided that such alteration or amendment is made after a hearing as provided in section 1127 of the Bankruptcy Code.

### B.    Governing Law.

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the CAB Plan and any agreements, documents, and instruments executed in connection with the CAB Plan, unless otherwise specified.

### C.    Plan Supplement.

Forms of the documents relating to the Term Sheet, including the New CAB Bedford Purchase Agreement and such other documents and information as CAB Bedford determines to be necessary or appropriate to the implementation and/or confirmation of the CAB Plan shall be contained in the Plan Supplement, which shall be filed with the Clerk of the Bankruptcy Court no later than twenty (20) days prior to the Confirmation Hearing.

### D.    Withholding and Reporting Requirements.

In connection with the CAB Plan and all instruments issued in connection herewith and distributions hereunder, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**E.    Transfer Free and Clear.**

Pursuant to section 1141(c) of the Bankruptcy Code, the transfer of the Property shall be free and clear of all claims and interests of creditors, equity security holders, and of general partners in the Debtor.

**F.    Exemption From Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer and exchange under the CAB Plan of any securities, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the CAB Plan, shall not be subject to any stamp tax or other similar tax.

**G.    Exhibits/Schedules.**

All exhibits and schedules to the CAB Plan and the Plan Supplement are incorporated into and constitute a part of the CAB Plan as if fully set forth therein.

**H.    Conflict.**

The terms of the CAB Plan shall govern in the event of any inconsistency with the summary of the CAB Plan set forth in this Disclosure Statement.  The terms of the Confirmation Order shall govern in the event of any inconsistency with the CAB Plan or the summary of the CAB Plan set forth in this Disclosure Statement.

**I.    Severability.**

If any provision in the CAB Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the CAB Plan.

**J.    Binding Effect.**

**The rights and obligations of any entity named or referred to in the CAB Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.**

**K.    Captions.**

**The headings contained in the CAB Plan are for convenience of reference only and do not affect the meaning or interpretation of the CAB Plan.**

## VII.    CONFIRMATION AND EFFECTIVENESS OF THE CAB PLAN

### A.    Conditions Precedent to Confirmation.

The CAB Plan shall not be confirmed by the Bankruptcy Court unless and until the following condition has been satisfied in full or waived by CAB Bedford:

(a)    the Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the CAB Plan in a form and substance acceptable to CAB Bedford;

(b)    the New CAB Bedford Purchase Agreement shall be in a form acceptable to CAB Bedford; and

(c)    the Confirmation Order shall be in a form acceptable to CAB Bedford.

### B.    Conditions Precedent to Effective Date.

This Plan shall not become effective unless and until the following conditions have been satisfied in full or waived by CAB Bedford:

(a)    the CAB Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be acceptable to the CAB Bedford;

(b)    the Confirmation Order shall have been entered by the Bankruptcy Court, in a form acceptable to CAB Bedford;

(c)    the Confirmation Order shall have become a Final Order and is in full force and effect; and

(d)    the transaction set forth in the New CAB Bedford Purchase Agreement shall be fully consummated.

### C.    Waiver of Conditions.

CAB Bedford may waive any or all of the conditions set forth in Article XI of the CAB Plan at any time without leave or order of the Bankruptcy Court.

### D.    Effect of Failure of Conditions.

In the event that the Effective Date does not occur on or prior to October 31, 2011 or such later date as may be agreed to by CAB Bedford (a) the Confirmation Order shall be vacated, (b) no distributions under the CAB Plan shall be made, (c) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the

Confirmation Date had never occurred, and (d) the Debtor's obligations with respect to the Claims and Interests shall remain unchanged.

## VIII.   NO DISCHARGE OF DEBTOR

### A.      No Discharge.

In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtor shall not receive any discharge of debt in this bankruptcy case.

Dated:  New York, New York
       August 10, 2011

CAB BEDFORD LLC


By:   /s/ Michael Cayre
      Name:  Michael Cayre
      Title:  Partner


By:   /s/ Kelley A. Cornish
      Kelley A. Cornish
      A Member of the Firm

Elizabeth R. McColm
Jonathan Koevary
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Main Telephone:  (212) 373-3000
Main Facsimile:  (212) 757-3990

*Attorneys for CAB Bedford LLC*

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---

**In re:**

**S & Y ENTERPRISES, LLC,**

Debtor.

Chapter 11

Case No. 10-50623 (ESS)

---

## CAB BEDFORD LLC'S PLAN OF REORGANIZATION
## OF S&Y ENTERPRISES, LLC DATED AUGUST 10, 2011

### ARTICLE I

### SUMMARY

1.01    This Plan under chapter 11 of the Bankruptcy Code, proposed by CAB Bedford LLC ("CAB Bedford"), proposes to pay all creditors of the Debtor[1] whose Claims are Allowed in full in cash from the proceeds of the sale of the real estate owned by the Debtor, located at 130 North 4th St. (a/k/a 193 Berry Street, a/k/a 240 Bedford Ave.), Brooklyn, New York, together with the adjoining real estate owned by Sky Lofts[2] located at 242-246 Bedford Avenue, Brooklyn, New York (collectively, the "Property"), in accordance with the terms set forth in the Term Sheet attached hereto as Exhibit A (the "New CAB Offer"). CAB Bedford will file a Plan Supplement containing that certain New CAB Bedford Purchase Agreement setting forth the definitive terms of the New CAB Offer at least twenty (20) days prior to the Confirmation Hearing on this Plan.

1.02    This Plan provides for three classes of secured claims; one class of priority unsecured claims, two classes of unsecured claims; and one class of equity Interests. Secured creditors and unsecured creditors holding Allowed Claims shall receive distributions of one hundred (100%) percent of their Allowed Claims in cash. This Plan also provides for the payment in full in cash of all Allowed Administrative Expense Claims and Allowed Priority Claims.

1.03    All creditors and equity Interest holders should refer to Articles III through VIII of this Plan for information regarding the precise treatment of their Claim. A Disclosure Statement that provides more detailed information regarding this Plan and the rights of creditors and equity Interest holders has been circulated with this Plan.

---

[1]    All capitalized terms herein shall have the meanings ascribed to them in Article II of this Plan.

[2]    Sky Lofts LLC, which filed for relief under chapter 11 of the Bankruptcy Code on December 8, 2010 in the Eastern District of New York (Case No. 10-51510-ESS), is an entity that shares the same management and equity ownership as the Debtor.  Concurrently with the filing of this Plan, CAB Bedford has filed a corresponding plan for Sky Lofts.

## ARTICLE II

## GENERAL PROVISIONS

2.01    _Definitions and Rules of Construction_.  The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions:

"Administrative Expense Claim Bar Date" means the first business day that is forty-five (45) days following entry of the Confirmation Order, or such later date as the Bankruptcy Court orders otherwise.

"Administrative Expense Claim" means a Claim for costs and expenses of administration of the Debtor's estate under sections 503(b) or 507 of the Bankruptcy Code, including, without limitation, for: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtor's estate and operating the businesses of the Debtor; (b) Allowed Claims of retained professionals in the Bankruptcy Case; and (c) all fees and charges assessed against the Debtor's estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

"Allowed" means, with respect to a Claim or Interest in the Bankruptcy Case, or any portion of such Claim or Interest in any class or category specified herein, a Claim or Interest that either (a) is listed in the Schedules, as of the Effective Date, as neither disputed, contingent nor unliquidated and with respect to which no contrary or superseding proof of claim has been filed, except any Insider Claims, which shall be deemed Disputed Claims pursuant to this Plan; (b) is evidenced by a proof of claim filed on or before the applicable Claims Bar Date and is not listed as disputed, contingent or unliquidated in the Schedules, and as to which no objection been filed on or before the Claims Objection Deadline; (c) is not the subject of an objection to allowance that (i) was filed on or before the Claims Objection Deadline and (ii) has not been settled, waived, withdrawn or denied pursuant to a Final Order; (d) is expressly Allowed (i) pursuant to a Final Order, or (ii) pursuant to the terms of this Plan.

"Balance" shall mean the Purchase Consideration minus the amount held in the Purchase Escrow.

"Bankruptcy Case" means the chapter 11 bankruptcy case of the Debtor.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of New York.

"CAB Bedford" means CAB Bedford, LLC.

"CAB Bedford Secured Claim" means the secured Claim of CAB Bedford against the Debtor in the principal amount of $575,000.00.

2

"CAB Bedford Unsecured Claim" means all Claims of CAB Bedford arising from or in connection with the Debtors' rejection of the Original Sale Agreement.

"CAB Plan" means this plan of reorganization of the Debtor dated August 10, 2011 proposed by CAB Bedford.

"Capital One" means Capital One, N.A.

"Capital One Adversary Proceeding" means that certain adversary proceeding captioned *S&Y Enterprises LLC* v. *Capital One, N.A.*, Adversary Proceeding No. 10-01328-ESS.

"Capital One Disputed Claim Amount" means $2,466,666.67, comprising the amount of interest and fees asserted by Capital One that will have accrued on the Capital One Secured Claim through December 5, 2012.

"Capital One Secured Claim" means the secured Claim of Capital One against the Debtor in the amount of $5,602,619.00, exclusive of any postpetition interest or fees.

"Claim" means "claim" as defined in section 101(5) of the Bankruptcy Code, as supplemented by section 102(2) of the Bankruptcy Code, against the Debtor.

"Claims Bar Date" means the last date to file proofs of claim as set forth in the Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Matter of Notice Thereof [S&Y Dkt. No. 20], establishing a deadline for filing proofs of claims against the Debtors of (i) March 4, 2011, at 5:00 P.M. (ET) for persons and entities; and (ii) June 6, 2011 for government units or as the Bankruptcy Court orders otherwise for Claims arising from the rejection of executory contracts or unexpired leases.

"Claims Objection Deadline" means the first business day that is ninety (90) days following entry of the Confirmation Order, or such later date as the Bankruptcy Court orders otherwise.

"Confirmation Date" means the date of entry of the Confirmation Order by the Bankruptcy Court.

"Confirmation Hearing" means the date(s) on which the Bankruptcy Court conducts a hearing to consider whether to confirm this Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming this Plan.

"Debtor" means S&Y Enterprises, LLC.

"Disclosure Statement" means the *Disclosure Statement for CAB Bedford LLC's Plan of Reorganization of S&Y Enterprises, LLC*, dated August 10, 2011,

as may be amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the CAB Plan.

"Disputed Claim" means (i) any Insider Claim, and (ii) any Claim, including any Administrative Expense Claim, against the Debtor to the extent that (a) the allowance of such Claim or any portion thereof is the subject of an objection, appeal or motion to estimate that has been timely filed by a party in interest and which objection, appeal or motion has not been determined by a Final Order, (b) such Claim is scheduled by the Debtor in the Schedules as disputed, contingent and/or unliquidated, (c) such Claim is in excess of the amount scheduled as other than disputed, unliquidated or contingent, or (d) such Claim may be subject to section 502(d) of the Bankruptcy Code.

"Disputed Insider Claims Reserve" means the reserve for payment of Disputed Insider Claims created pursuant to Article VI of this Plan.

"Disputed Non-Insider Claims Reserve" means the reserve for the payment of Disputed Claims that are not Insider Claims created pursuant to Article VI of this Plan.

"Effective Date" means the first business day on which all of the conditions specified in Article XI of this Plan have been satisfied or waived in accordance with Article XI of this Plan; provided, however, that if a stay of the Confirmation Order is in effect on such date, the Effective Date will be the first business day after such stay is no longer in effect.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction (a) that has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, further review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay or rehearing is pending.

"Galster Funding" means Galster Funding LLC.

"Galster Funding Secured Claim" means the secured Claim of Galster Funding against the Debtor in the amount of $750,000.00.

"Initial Distribution Date" means the Effective Date or as soon thereafter is practicable.

"Insider" means "insider" as defined in section 101(31) of the Bankruptcy Code.

"Insider Claim" means any Claim originally held by an Insider, regardless of whether such Claim is or was subsequently transferred to a non-Insider, including, without limitation, the following Insider Claims set forth on Schedule F of S&Y's Schedules and Statement of Financial Affairs dated March 2, 2011: (i) unsecured nonpriority claim of Maple St., LLC in the amount of $840,000.00; (ii) unsecured nonpriority claim of Pacific Dean Realty, LLC in the amount of $340,000.00; (iii) unsecured nonpriority claim of The Backer Group, LLC in the amount of $1,089,000.00; and (iv) unsecured nonpriority claim of Yehuda Backer in an "unknown" amount.

"Interest" means all rights arising from any equity security (as defined in section 101(16) of the Bankruptcy Code) of the Debtor, or membership interest in the Debtor.

"New CAB Bedford Purchase Agreement" means the sale agreement to be filed as a Plan Supplement setting forth the definitive terms of the New CAB Offer, as defined in Section 1.01 of this Plan.

"New CAB Offer" shall have the meaning set forth in Section 1.01 of this Plan.

"North 3rd" means North 3rd Development LLC.

"North 3rd S&Y Claim" means the unsecured Claim of North 3rd, the amount of which excludes all amounts due to North 3rd that is allocable to Sky Lofts.

"Original Sale Agreement" means the agreement of sale between the Debtor, Sky Lofts and CAB Bedford dated July 12, 2010, as amended, for the Property.

"Petition Date" means November 11, 2010, the date on which S&Y commenced its Chapter 11 Case.

"Plan" means this plan of reorganization of the Debtor dated August 10, 2011 proposed by CAB Bedford.

"Plan Supplement" means the forms of documents specified in Section 10.03 of this Plan.

"Priority Claim" means any Claim entitled to priority treatment under section 507 of the Bankruptcy Code.

"Property" means the S&Y Property and the Sky Lofts Property.

"Purchase Consideration" means the amount, $21,969,118.00, to be paid by CAB Bedford for the Property pursuant to the New CAB Bedford Purchase Agreement.

"Purchase Escrow" shall mean $1,000,000.00 deposited by CAB Bedford in escrow as a good faith deposit for the purchase of the Property.

"Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims and Interests entitled to receive distributions under this Plan, which date shall be the Effective Date.

"S&Y Property" means the Property of the Debtor located at 130 North 4th St. (a/k/a 193 Berry Street, a/k/a 240 Bedford Ave.), Brooklyn, New York.

"Schedules" means the schedules of assets and liabilities, the list of holders Interests and the statements of financial affairs filed with the Bankruptcy Court by the Debtor, including any amendments or supplements thereto.

"Sky Lofts" means Sky Lofts, LLC, which is an affiliate of the Debtor that filed for relief under chapter 11 of the Bankruptcy Code on December 8, 2010 in the Eastern District of New York (Case No. 10-51510-ESS).

"Sky Lofts Property" means the Property of the Debtor located at 242-246 Bedford Ave, Brooklyn, New York that is adjacent to the S&Y Property.

"Term Sheet" means the Term Sheet setting forth the New CAB Offer attached to this Plan as Exhibit A.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.01    Class I. **Classification:** Class I consists of the Capital One Secured Claim. Class I is an unimpaired class.

**Treatment:** The Capital One Secured Claim shall be Allowed on the Effective Date and paid in full in cash on the Initial Distribution Date using funds from the Purchase Consideration. As of the Effective Date, an amount equal to the Capital One Disputed Claim Amount shall be held in the Disputed Claims Reserve. To the extent the Capital One Disputed Claim is Allowed, in whole or in part, such Allowed amounts shall be paid in full in cash within ten (10) days of entry of a Final Order providing for such allowance.

3.02    Class II. **Classification:** Class II consists of the CAB Bedford Secured Claim. Class II is an unimpaired class.

**Treatment:** The CAB Bedford Secured Claim, including all accrued and unpaid interest accruing on such Claim, shall be Allowed on the Effective Date and paid in full in cash on the Initial Distribution Date.

3.03    <u>Class III</u>. **Classification:** Class III consists of the Galster Funding Secured Claim. Class III is an unimpaired class.

**Treatment:** The Galster Funding Secured Claim, including accrued and unpaid interest accruing on such Claim, shall be Allowed on the Effective Date and paid in full in cash on the Initial Distribution Date.

3.04    <u>Class IV</u>. **Classification:** Class IV consists of all Priority Claims. Class IV is an unimpaired class.

**Treatment:** Class IV Claims shall be Allowed on the Effective Date and paid in full in cash on the Initial Distribution Date.

3.05    <u>Class V</u>. Class V consists of all general unsecured nonpriority Claims that are not Insider Claims, including, but not limited to, the North 3rd S&Y Claim. Class V is an unimpaired class.

**Treatment:** Class V Claims, to the extent Allowed on the Effective Date, shall be paid in full in cash on the Initial Distribution Date. To the extent a Class V Claim is not Allowed or constitutes a Disputed Claim as of the Effective Date, an amount equal to the disputed portion of any such Claim shall be held in the Disputed Non-Insider Claims Reserve pending resolution of the Claim. The Allowed amount of the Claim shall be paid in full in cash to the holder of such Claim within ten (10) days of entry of a Final Order providing for such allowance.

3.06    <u>Class VI</u>. Class VI consists of all Insider Claims. Class VI is an unimpaired class.

**Treatment:** Class VI Claims, to the extent Allowed on the Effective Date, shall be paid in full in cash on the Initial Distribution Date. To the extent a Class VI Claim is neither Allowed nor disallowed as of the Effective Date, an amount equal to the disputed portion of any such Claim shall be held in the Disputed Insider Claims Reserve pending resolution of the Claim. The Allowed amount of the Claim shall be paid in full in cash to the holder of such Claim within ten (10) days of entry of a Final Order providing for such allowance.

3.07    <u>Class VII</u>. **Classification:** Class VII consists of Interests in the Debtor. Class VII is an unimpaired class.

**Treatment:** Upon the Effective Date, holders of Class VII Interests shall retain their Interests in the Debtor.

## ARTICLE IV

## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS
## AND U.S. TRUSTEE FEES

4.01   <u>United States Trustee Fees</u>.  All fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) shall accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code.  Any U.S. Trustee Fees owed on or before the Effective Date of this Plan shall be paid on the Initial Distribution Date.

4.02   <u>Administrative Expense Claims</u>.  All Allowed Administrative Expense Claims shall be paid in full on or before the Initial Distribution Date, or, if Allowed subsequent to the Initial Distribution Date, then within ten (10) days of entry of a Final Order providing for such allowance.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE CAB PLAN

5.01   On the Effective Date:

  (a)   CAB Bedford shall release the Purchase Escrow and tender the Balance to the Debtors in exchange for the Property free and clear of all liens and claims;

  (b)   CAB Bedford shall be deemed to have waived the CAB Bedford Unsecured Claim; and

  (c)   The Debtors shall establish the Disputed Non-Insider Claims Reserve and the Disputed Insider Claims Reserve in accordance with Article VI of this Plan.

5.02   The Purchase Consideration shall be distributed by the Debtor to classes of Claims and Interests, or as otherwise provided, in accordance with Article VI herein.

5.03   On and after the Effective Date, the Debtor shall retain, and have the sole right to prosecute, the Capital One Adversary Proceeding.

## ARTICLE VI

## PROVISIONS REGARDING DISTRIBUTIONS UNDER
## THIS PLAN AND TREATMENT OF DISPUTED CLAIMS

6.01    Distributions.

(a)    <u>Delivery of Distributions</u>. Distributions under this Plan shall be made by the Debtor or its designee to the holders of all Allowed Claims at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of Claim or transfers of Claim filed pursuant to Rule 3001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

(b)    <u>Distribution of Cash</u>. Any payment of cash by the Debtor pursuant to this Plan shall be made at the option and in the sole discretion of the Debtor by a check drawn on, or wire transfer from, a bank selected by the Debtor.

(c)    <u>Distributions to Holders as of the Record Date</u>. As of the close of business on the Record Date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtor shall have no obligation to recognize any transfer of any Claims occurring after the Record Date. The Debtor shall instead be entitled to recognize and deal for purposes of this Plan with only those record holders stated on the claims register as of the close of business on the Record Date.

(d)    <u>Saturdays, Sundays, or Legal Holidays</u>. If any payment or act under this Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, and shall be deemed to have been completed as of the required date.

(e)    <u>Distributions for Claims Allowed as of the Effective Date</u>. On the Initial Distribution Date, the Debtor shall make the distributions pursuant to this Plan to the holders of Allowed Claims.

6.02    Disputed Non-Insider Claims Reserve.

(a)    <u>Establishment of Disputed Non-Insider Claims Reserve</u>. On the Effective Date or as soon as practicable thereafter, the Debtor shall create a Disputed Non-Insider Claims Reserve in an amount of Cash equal to one hundred percent (100%) of distributions to which holders of Disputed Claims that are not Insider Claims would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their Disputed Claim amounts (excluding duplicate Claims).

(b)     Cash Held in the Disputed Non-Insider Claims Reserve. Cash held in the Disputed Non-Insider Claims Reserve shall be segregated and designated as held in trust for the benefit of holders of Allowed Claims that are not Insider Claims.  Subject to subsection (d) below, cash held in the Disputed Non-Insider Claims Reserve shall not constitute property of the Debtor.  The Debtor shall pay, or cause to be paid, out of the funds held in the Disputed Non-Insider Claims Reserve, any tax imposed on the Disputed Non-Insider Claims Reserve by any governmental unit with respect to income generated by cash held in the Disputed Non-Insider Claims Reserve.

(c)     Distributions Withheld for Disputed Claims.  The holder of a Disputed Claim that is not an Insider Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive a distribution of cash (with any post-Effective Date interest thereon earned in the Disputed Non-Insider Claims Reserve) from the Debtor, as applicable, within ten (10) days of entry of a Final Order providing for such allowance.

(d)     Excess Cash.  If after the resolution by stipulation or Final Order of any Disputed Claim that is not an Insider Claim there remains cash in the Disputed Non-Insider Claims Reserve in excess of the distributions that holders of such Allowed Claim(s) are entitled to receive from such Disputed Non-Insider Claims Reserve, such cash shall immediately be transferred to and vest in the Debtors.

6.03    Disputed Insider Claims Reserve.

(a)     Establishment of Disputed Insider Claims Reserve.  On the Effective Date or as soon as practicable thereafter, the Debtor shall create a Disputed Insider Claims Reserve in an amount of $2,269,000.00.

(b)     Cash Held in the Disputed Insider Claims Reserve.  Cash held in the Disputed Insider Claims Reserve shall be segregated and designated as held in trust for the benefit of holders of Allowed Claims that are Insider Claims.  Subject to subsection (d) below, Cash held in the Disputed Insider Claims Reserve shall not constitute property of the Debtor.  The Debtor shall pay, or cause to be paid, out of the funds held in the Disputed Insider Claims Reserve, any tax imposed on the Disputed Insider Claims Reserve by any governmental unit with respect to income generated by cash held in the Disputed Insider Claims Reserve.

(c)     Distributions Withheld for Disputed Insider Claims.  The holder of a Disputed Claim that is an Insider Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive a distribution of cash (with any post-Effective Date interest thereon earned in the Disputed Insider Claims Reserve) from the Debtor, as applicable, within ten (10) days of entry of a Final Order providing for such allowance.

(d)     Excess Cash.  If after the resolution by stipulation or Final Order of any Disputed Claim that is an Insider Claim there remains cash in the Disputed Insider Claims Reserve in excess of the distributions that holders of such Allowed Claim(s) are entitled to receive from such Disputed Insider Claims Reserve, such cash

shall immediately be transferred to CAB Bedford or its designee, in the manner and to the location to be designated by CAB Bedford.

## ARTICLE VII

## ALLOWANCE AND DISALLOWANCE OF CLAIMS

7.01    Objections to Claims that are not Allowed Claims as of the Effective Date shall be filed and served on the holders of such Claims by the Claims Objection Deadline. The Debtor will have the sole authority to object to Claims, except any part in interest may object to any Insider Claim. If an objection has not been filed to a proof of claim or a Claim listed in the Schedules as neither disputed, contingent nor unliquidated by the Claims Objection Deadline, the Claim to which the proof of claim or Schedules relates shall then be deemed an Allowed Claim. To the extent such objection concerns the amount of the Claim, the undisputed portion of such Claim shall be deemed an Allowed Claim on the Claims Objection Deadline and the remaining portion shall be deemed a Disputed Claim. The Debtor will have no obligation to review and/or respond to any Claim that is not filed by the applicable bar date unless: (i) the filer has obtained an order from the Bankruptcy Court authorizing it to file such Claim; or (ii) the Debtor have consented to the filing of such Claim in writing.

7.02    Holders of Administrative Expense Claims (except for any fees or charges assessed against the Estates under section 1930 of title 28 of the United States Code) not paid prior to the Confirmation Date shall submit requests for payment on or before the Administrative Expense Claims Bar Date or forever be barred from doing so and from receiving payment thereof. The Debtor shall have until the Claims Objection Deadline to review and object to all applications for the allowance of Administrative Expense Claims.

7.03    The Debtor will have the power and authority to settle and compromise a Disputed Claim except any Insider Claim with Bankruptcy Court approval and compliance with Bankruptcy Rule 9019.

## ARTICLE VIII

## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.01    Executory Contracts and Unexpired Leases. All executory contracts and unexpired leases are deemed rejected on the Effective Date.

8.02    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases. All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to this Plan, if any, shall be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any entity that is required to file a proof of claim arising from the rejection of an executory contract or an unexpired lease that fails to timely do so shall be forever barred, estopped

and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtor the estate or any of their respective property, or the Debtor and such Claim shall be forever discharged.

## ARTICLE IX

## RETENTION OF JURISDICTION

9.01    The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Case and the CAB Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:  (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Interest; (5) to hear and determine timely objections to, or other proceedings challenging the allowance of Claims; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the CAB Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the CAB Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the CAB Plan requires an order of, or other relief from, the Bankruptcy Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine any Causes of Action preserved under the CAB Plan; and (14) to enter a final decree closing the Bankruptcy Case.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

10.01    Modification of the CAB Plan.

(a)    Pre-Confirmation Modifications.

CAB Bedford may alter, amend, or modify the CAB Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code.

(b)    Post-Confirmation Immaterial Modifications.

After the Confirmation Date, CAB Bedford may, with the approval of the Bankruptcy Court, without notice to all holders of Claims and Interests, insofar as it does not materially and adversely affect the holders of Claims and Interests, correct any defect, omission or inconsistency in the CAB Plan in such manner and to such extent as may be necessary to facilitate consummation of the CAB Plan.

(c)    Post-Confirmation Material Modifications.

After the Confirmation Date, CAB Bedford may alter or amend the CAB Plan in a manner which, as determined by the Bankruptcy Court, materially and adversely affects holders of Claims or Interests, provided that such alteration or amendment is made after a hearing as provided in section 1127 of the Bankruptcy Code.

10.02    Governing Law.

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of New York (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the CAB Plan and any agreements, documents, and instruments executed in connection with the CAB Plan, unless otherwise specified.

10.03    Plan Supplement.

Forms of the documents relating to the Term Sheet, including the New CAB Bedford Purchase Agreement and such other documents and information as CAB Bedford determines to be necessary or appropriate to the implementation and/or confirmation of the CAB Plan shall be contained in the Plan Supplement, which shall be filed with the Clerk of the Bankruptcy Court no later than twenty (20) days prior to the Confirmation Hearing.

10.04    Withholding and Reporting Requirements.

In connection with the CAB Plan and all instruments issued in connection herewith and distributions hereunder, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

10.05    Transfer Free and Clear.

Pursuant to section 1141(c) of the Bankruptcy Code, the transfer of the Property shall be free and clear of all claims and interests of creditors, equity security holders, and of general partners in the Debtor.

10.06   Exemption From Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer and exchange under the CAB Plan of any securities, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or other similar tax.

10.07   Exhibits/Schedules.

All exhibits and schedules to the CAB Plan and the Plan Supplement are incorporated into and constitute a part of the CAB Plan as if fully set forth herein.

10.08   Conflict.

The terms of this Plan shall govern in the event of any inconsistency with the summary of the CAB Plan set forth in the Disclosure Statement.  The terms of the Confirmation Order shall govern in the event of any inconsistency with the CAB Plan or the summary of the CAB Plan set forth in the accompanying Disclosure Statement.

10.09   Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

10.10   Binding Effect.

The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

10.11   Captions.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

## ARTICLE XI

## CONFIRMATION AND EFFECTIVENESS OF THE CAB PLAN

11.01   Conditions Precedent to Confirmation.

This Plan shall not be confirmed by the Bankruptcy Court unless and until the following condition has been satisfied in full or waived by CAB Bedford:

(a)    the Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to this Plan in a form and substance acceptable to CAB Bedford;

(b)    the New CAB Bedford Purchase Agreement shall be in a form acceptable to CAB Bedford; and

(c)    the Confirmation Order shall be in a form acceptable to CAB Bedford.

11.02    Conditions Precedent to Effective Date.

This Plan shall not become effective unless and until the following conditions have been satisfied in full or waived by CAB Bedford:

(a)    the CAB Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be acceptable to the CAB Bedford;

(b)    the Confirmation Order shall have been entered by the Bankruptcy Court, in a form acceptable to CAB Bedford;

(c)    the Confirmation Order shall have become a Final Order and is in full force and effect; and

(d)    the transaction set forth in the New CAB Bedford Purchase Agreement shall be fully consummated.

11.03    Waiver of Conditions.

CAB Bedford may waive any or all of the conditions set forth in this Article XI at any time without leave or order of the Bankruptcy Court.

11.04    Effect of Failure of Conditions.

In the event that the Effective Date does not occur on or prior to October 31, 2011, or such later date as may be agreed to by CAB Bedford (a) the Confirmation Order shall be vacated, (b) no distributions under the CAB Plan shall be made, (c) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtor's obligations with respect to the Claims and Interests shall remain unchanged.

## ARTICLE XII

## NO DISCHARGE OF DEBTOR

12.01  No Discharge.  In accordance with § 1141(d)(3) of the Bankruptcy Code, the Debtor shall not receive any discharge of debt in this bankruptcy case.

Dated:  New York, New York
        August 10, 2011

              CAB BEDFORD LLC

              By:    /s/ Michael Cayre
                        Name:  Michael Cayre
                        Title:  Partner

              By:    /s/ Kelley A. Cornish
                        Kelley A. Cornish
                        A Member of the Firm

              Elizabeth R. McColm
              Jonathan Koevary
              PAUL, WEISS, RIFKIND, WHARTON &
              GARRISON LLP
              1285 Avenue of the Americas
              New York, New York  10019-6064
              Main Telephone:  (212) 373-3000
              Main Facsimile:  (212) 757-3990

              *Attorneys for CAB Bedford LLC*

**EXHIBIT A**
**TO CAB BEDFORD LLC'S PLAN OF REORGANIZATION**
**OF S&Y ENTERPRISES, LLC DATED AUGUST 10, 2011**

TERM SHEET RE PURCHASE OF PROPERTY

1.     Property to be Acquired.  240-246 Bedford Avenue, 118 North 4th Street and 193 Berry Street, Brooklyn, New York, also known as Block 2351, Lots 6 and 24.

2.     Sellers. Sky Lofts LLC and S&Y Enterprises LLC.

3.     Purchaser. CA Bedford LLC or affiliated assignee.

4.     Structure.     The structure of the sale shall be all-cash in exchange for the transfer of the Property free and clear of all liens, claims and encumbrances to Purchaser at closing.

5.     Purchase Price.     The total amount of $21,969,118.00, subject to reimbursement of any excess proceeds of those certain Disputed Insider Claims Reserves as defined in the Plans of Reorganization of the Sellers dated August 10, 2011 (the "Plans").

6.     Other Key Terms.  Simultaneous with the filing of a Purchase and Sale Agreement ("PSA") in accordance with the Plans, Purchaser shall deposit a "refundable" deposit in the amount of One Million Dollars ($1,000,000) to be held in escrow by a title agency selected by Purchaser pursuant to the terms of the PSA as "escrow agent" (said title agency shall execute the PSA as escrow agent).  The deposit shall only be refundable in the event of Sellers' failure to close or inability to pass title to Purchaser on the terms set forth in the PSA.

7.     Closing.  Closing shall occur within forty-five (45) days following Court Approval (defined below).

8.     Occupancies.  The Property shall be conveyed free of all occupancies, leases, tenancies, licenses and/or similar arrangements.

9.     Investigation.  Purchaser has fully inspected the Property and is familiar with the conditions thereat.  There shall be no further due diligence required by Purchaser and the Property shall be conveyed in "as-is" condition.

10.     Status of Title. Title to the Property shall be passed by Sellers without lien or encumbrance whatsoever.  Subject to the foregoing, Purchaser shall accept title subject to:

(i)     Municipal zoning ordinances and existing variances;

(ii)     Recorded covenants, easements and restrictions existing as of record as of the date hereof;

(iii)    The state of facts set forth on that certain survey of the Property dated July 12, 2010 and prepared by AAA Group; and

(iv)    Unpaid nondelinquent real estate taxes and assessments, subject to standard adjustment.

11.    <u>Court Approval</u>. Purchaser acknowledges that Sellers have filed petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. Section 101 et. seq. (the "<u>Bankruptcy Code</u>") with the United Stated Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>").  Accordingly, the validity and enforceability of the PSA shall be specifically subject to and conditioned upon entry of an order of the Bankruptcy Court approving the sale of the Property pursuant to the PSA (the "<u>Bankruptcy Court Approval Order</u>") in substance reasonably acceptable to Purchaser.